**GOLDEN PANAGIA STEAMSHIP,
INC., Plaintiff-Appellant,**

v.

**The PANAMA CANAL COMMISSION
and the United States of America,
Defendants-Appellees.**

**GOLDEN PANAGIA STEAMSHIP,
INC., Plaintiff-Appellant,**

v.

**The UNITED STATES DEPARTMENT
OF JUSTICE, et al.,
Defendants-Appellees.**

Nos. 83–3186, 85–3168.

United States Court of Appeals,
Fifth Circuit.

June 13, 1986.

G. Gordon Starling, Jr., Gelpi, Sullivan, Carroll & LaBorde, Gerard T. Gelpi, New Orleans, La., for plaintiff-appellant.

William F. Baity, Asst. U.S. Atty., John P. Volz, U.S. Atty., New Orleans, La., Jan Von Flatern, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendants-appellees.

Before GOLDBERG, HILL and JONES, Circuit Judges.

IRVING L. GOLDBERG, Circuit Judge:

It is sometimes said that "two ships passing in the night" is a bad thing. This case proves that the opposite result—two ships colliding in broad daylight—may not always be desirable either. When such a meeting of minds, men, and machinery occurs in the Panama Canal, the situation becomes even more complicated than usual. Appellant Golden Panagia sued the responsible American authorities in the U.S. District Court in Panama for $300,000 in damages to its ship—only to have its attorney "settle" the case for $195,000 and pocket the cash, never to be heard from again.... Golden Panagia got to the bottom of this affair about a year later, but by then the courts of the United States had also vanished from the Panamanian scene. Undeterred, Golden Panagia filed two further suits against the U.S. Government in the Eastern District of Louisiana, the first to reopen the case supposedly settled in Panama, the second for another $195,000 check to replace the one stolen by its attorney. The district court dismissed the first case on jurisdictional grounds and ruled against Golden Panagia in the second because it found no negligence on the Government's part. We affirm both decisions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On February 1, 1979, the good ship M/V Golden Panagia, owned and operated by plaintiff-appellant Golden Panagia Steamship, Inc. ("Golden Panagia"), collided with the equally good ship M/V World Agamemnon in the Panama Canal. At the time of the collision each ship was under the command of a pilot employed by the Panama Canal Company, as required by regulations then in effect. 35 C.F.R. §§ 105.1 and 105.-6.[1]

Golden Panagia retained as counsel Henry L. Newell, a Panamanian attorney, and on September 18, 1979, Newell filed suit against the Panama Canal Company in the United States District Court for the District of the Canal Zone for damages of $303,797.11 sustained by the M/V Golden Panagia. *Golden Panagia Steamship, Inc. v. Panama Canal Company*, No. 79–343–B (D.C.Z.1979) ("Golden Panagia I"). On October 1, 1979, the Panama Canal Treaty of 1977 went into effect, which provided for the Panama Canal Company to cease operations in Panama; in its place Congress substituted the Panama Canal Commission as an agency in the Executive Branch of the United States Government.

> Among the most important tasks in the waterway is that of the 230 pilots who guide the ships through the narrow locks from ocean to ocean. At present, almost all are North Americans. But under a special program Panamanians are being trained for the tricky work in which a misjudgment of a few feet can result in dented hulls, crushed piers *and costly lawsuits.*
>
> (emphasis added).

1. The Panama Canal Company was a federally chartered company created by Congress to operate the Canal. Act of September 26, 1950, 64 Stat. 1041; Canal Zone Code Title 2, § 61 (1963). Suit against the Panama Canal Company was authorized by C.Z.Code Title 2, § 65. Section 292 of Title 2 provided that the Panama Canal Company was liable for the fault of its pilots.

See LeMoyne, *Is Panama Set to Run the Canal?*, N.Y. Times, May 8, 1986 at 6, col. 1 (national ed.):

Panama Canal Treaty of 1977, art. III, ¶ 10; Panama Canal Act of 1979, P.L. 96–70, 22 U.S.C. § 3611.

In June, 1981, Newell entered into a settlement agreement with the United States, and the parties submitted to the court, Sear, J., a Consent Judgment, which stated in part:

> The parties by their respective attorneys, Frank J. Violanti, United States Attorney for the United States of America, the successor in interest to the Defendant, Panama Canal Company; Henry L. Newell, attorney for Plaintiff, Golden Panagia Steamship, Inc. ... having agreed to settle the claims asserted herein, it is hereby
>
> ORDERED, ADJUDGED, AND DECREED:
>
> That Henry L. Newell, as attorney for Plaintiff, Golden Panagia Steamship, Inc., receive from the Defendant the sum of one hundred ninety-five thousand three hundred eighteen dollars and fifty cents ($195,318.50) without interest and without costs....

Violanti, Newell, and Judge Sear signed the Consent Judgment, which was entered June 15, 1981. Thereafter the Government gave Newell a United States Treasury check in the amount of $195,318.50 made payable to "Henry L. Newell as Attorney for Golden Panagia Steamship Inc." Newell acknowledged receipt of the funds in a Satisfaction of Judgment executed by him and filed in the court on July 20, 1981.

On March 31, 1982, the jurisdiction of the United States Courts in the Republic of Panama ended and the district court ceased operations. When the Panama Canal Treaty of 1977 went into effect on October 1, 1979, U.S. courts in Panama were denied jurisdiction over new cases; however, art. XI, ¶ 6, granted them full jurisdiction for thirty months (i.e., until March 31, 1982) to dispose of cases "already instituted and pending before the courts prior to the entry into force of [the] Treaty."

On April 23, 1982, Golden Panagia attempted to re-open its case by bringing an action against the Panama Canal Commission and the United States in the United States District Court for the Eastern District of Louisiana. *Golden Panagia Steamship, Inc. v. Panama Canal Commission, the United States of America,* 557 F.Supp. 340 (E.D.La.1983) ("Golden Panagia II"). In its Complaint Golden Panagia alleged in part:

## VIII.

The United States of America negligently issued a check payable to Henry Newell as attorney for the M/V GOLDEN PANAGIA rather than issuing the check for settlement to plaintiff.

## IX.

Attorney Newell then obtained the funds, executed satisfaction of judgment, and stole the funds.

## X.

Plaintiff had no knowledge of the settlement negotiations and extended no authority to attorney Newell to settle the case.

Golden Panagia sought by motion to "set aside the aforementioned settlement and judgment entered into fraudulently and without authority by attorney Newell and reinstate said suit" in order to relitigate its original claim. In the alternative, Golden Panagia demanded judgment against the United States and the Panama Canal Commission in the amount of $195,318.50, for the alleged negligence of the U.S. Attorney in paying the settlement amount directly to Newell. The district court, Sear, J., found that it lacked jurisdiction to consider these claims and granted the Government's motion to dismiss on February 11, 1983. Golden Panagia filed a timely Notice of Appeal, but proceedings in this court were stayed pending resolution of yet another suit, described below.

On January 3, 1984, Golden Panagia brought another action in the United States District Court for the Eastern District of Louisiana, this time against the United

States Department of Justice and the United States. *Golden Panagia Steamship, Inc. v. The United States Department of Justice, et al.,* No. 84–22 (E.D.La.) ("Golden Panagia III"). The Complaint in this suit alleged jurisdiction under the Federal Tort Claims Act, stated that all administrative remedies under the Act had been exhausted, restated the previous claims of negligence, and again demanded judgment against the Government in the amount of $195,318.50. The case proceeded to trial and was submitted to the district court, Sear, J., on depositions, exhibits, and briefs. The court found that Newell had acted with "apparent authority" at all times and that the United States had no reason to foresee that he would steal the settlement funds. Finding no negligence, the court rendered judgment in favor of the United States on February 26, 1985. Golden Panagia filed a timely Notice of Appeal, and its Motion to Consolidate this action with the previously stayed action was granted by this court.

## II. THE ACTION FOR REINSTATEMENT (GOLDEN PANAGIA II)

■ In its Complaint in the action for reinstatement of the suit supposedly settled in Panama, Golden Panagia alleges no specific bases for jurisdiction by the United States District Court for the Eastern District of Louisiana. Reading the pleadings charitably, however, the district court construed them as either a motion or an independent action for relief from judgment under Fed.R.Civ.P. 60(b). Considered as a motion for reinstatement, the suit had to be dismissed because it was not brought "in the court and in the action in which the judgment was rendered." Advisory Committee Note to 1946 Amendment, Fed.R. Civ.P. 60(b); *Bankers Mortgage Company v. United States,* 423 F.2d 73, 78 (5th Cir.) *cert. denied,* 399 U.S. 927, 90 S.Ct. 2242, 26 L.Ed.2d 793 (1970). Considered as an independent action, the suit had to be dismissed because the district court lacked subject matter jurisdiction. The court noted that the United States has specifically excluded "any claim arising from the activities of the

Panama Canal Company" from its general acceptance of tort liability under the Federal Tort Claims Act, 28 U.S.C. § 2680(m), and that only administrative remedies are available in such a situation under the Panama Canal Act of 1979, §§ 1401, 1416. As for alleged U.S. Government negligence outside of the Panama Canal, the court observed that Golden Panagia had not exhausted its administrative remedies, as required under 28 U.S.C. § 2675(a).

We adopt the opinion of the district court, *Golden Panagia S.S. Inc. v. Panama Canal Com'n,* 557 F.Supp. 340 (E.D. La.1983), in affirming its dismissal of Golden Panagia's action for reinstatement. Insofar as Golden Panagia's jurisdictional claims turn on the contention that "there was no settlement of Golden Panagia's claim against the Government" because "Newell did not have authority to settle the claim or enter into a consent judgment," Appellant's Brief at 16, 19, our discussion in the following section will also be relevant to the action for reinstatement.

## III. THE FEDERAL TORT CLAIMS ACTION (GOLDEN PANAGIA III)

■ After its first suit in the Eastern District of Louisiana was dismissed, Golden Panagia took the district court's hint and exhausted its administrative remedies under the Federal Tort Claims Act. It then filed a suit restating its claim that the Government was negligent in issuing the settlement check directly to attorney Newell and demanding that Golden Panagia receive from the Government another $195,000 check.

In this action Golden Panagia does not seek to overturn the settlement agreement or Consent Judgment as such, but simply attacks the "negligent and otherwise improper issuance of the check to Henry W. Newell by the United States of America and the United States Department of Justice." Complaint ¶ XIV. Nevertheless, it is clear that the validity of the settlement agreement and the Consent Judgment is central to this action as well; otherwise,

Golden Panagia would have no case whatsoever. On the undisputed facts, Henry Newell, Golden Panagia's attorney of record, and the Government jointly submitted to the district court a signed Consent Judgment stipulating that the Government would pay over $195,318.50 to "Henry L. Newell, as attorney for Plaintiff, Golden Panagia Steamship, Inc.," in full satisfaction of Golden Panagia's claims. The court approved this method of settlement and signed the Consent Judgment containing the exact above-quoted language. The Government then issued a check for $195,318.50 to "Henry L. Newell as Attorney for Golden Panagia Steamship Inc.," in strict and literal compliance with the terms of the Consent Judgment. On these facts, then, the procedures used by the Government in issuing the check are unimpeachable, unless Golden Panagia can show that the settlement process leading up to the issuance of the check was somehow suspect.

A. *Authority, Actual and Apparent*

Golden Panagia's central contention is that "Newell did not have authority to settle the claim or enter into a consent judgment" on Golden Panagia's behalf. Appellant's Brief at 19. We note at the outset that Golden Panagia specifically declines to dispute the district court's Finding of Fact that "Newell acted with apparent authority on behalf of plaintiff." Finding of Fact no. 17; *cf.* Appellant's Brief at 30. The court also made the following findings of fact:

7.

Newell was attorney of record for plaintiff from February, 1979 through March, 1982.

. . . .

13.

On June 15, 1981 Newell, without plaintiff's knowledge or consent, entered into an agreement with the United States to settle plaintiff's claim.

. . . .

18.

At no time prior to the settlement did the plaintiff or any of its representatives indicate to any official of the United States, the Panama Canal Company or the Panama Canal Commission that Mr. Newell did not possess the authority to enter into the settlement negotiations and execute the consent judgment at issue in this case.

19.

No special circumstances existed at the time of settlement to put any government official on notice of an expectation that Newell might convert the funds to his own use.

20.

Previous settlement of maritime claims, wherein Newell represented various other plaintiffs, were consummated in the same manner as in this case, without incident.

21.

The method of payment of claims employed in this case is widely used throughout the United States and did not violate any law or Department of Justice regulation.

The thirty-month "wind up" period prior to March 31, 1982, when the jurisdiction of the United States Courts ended in Panama, was apparently a hectic one in the courts. Frank Violanti, then the U.S. Attorney in Panama, testified as follows:

There was a large number of cases pending, admiralty cases. Counting them all, I think Judge Sear, at one time, had over seven hundred (700) cases. And, there was quite a bit of concern about disposing all of those cases.... Now, even Judge Sear would put a lot of pressure on us to move the cases, for all parties to be able to come in with authority to settle their cases. They didn't want much delay occasioned by the inability of an attorney to be able to contact his principal and get authority. They were able to come into these conferences ...

settlement conferences with the authority to settle the cases.

*Violanti Dep.* at 24. Violanti also testified that the principals in these cases were "virtually, in all instances in a foreign country." *Id.* at 25.

The record in this case discloses that a steady stream of letters, cables, and telephone calls flowed between Henry Newell and the New York and New Jersey representatives of Golden Panagia. From at least as early as 1980, the possibility of settlement was discussed in many of these communications. For example, on July 18, 1980, Newell wrote to Golden Panagia's New York counsel:

On July 3, 1980, all parties attended a Preliminary Conference, copy of which is enclosed. From discussions it appeared that once the documentary evidence required of us is produced there exists the possibility of serious settlement discussions.

Similarly, on August 29, 1980, Newell wrote:

The trial date has been tentatively set for October 13, 1980, but that date is not flexible because the record will also reflect that we are beginning to engage in settlement negotiations which may cause a further postponement.

Eventually, the discussion of settlement prospects became focused on specific proposals, as an October 29, 1980, letter to Newell indicates:

We would appreciate your confirmation that settlement on basis of 80% of provable damages means that, at trial, the Panama Canal Company will admit liability, and try damages alone.

Before we can recommend to Owners that the Panama Canal Company's offer of settlement be accepted, we will need your opinion on Owners' chances of proving a liability case against the Panama Canal Company and the probable amount of provable damages.

A letter to Newell of December 1, 1980, was in the same vein:

With regard to your letter of November 13, 1980 we would request your opinion on an estimate of recoverable damages in this matter. We understand that Lygnos Brothers has provided you with copies of supporting documents, and we would appreciate your advice on which items of damages would be recoverable, and which would not be recoverable.

Further, in order to assess whether Owners should accept 80% settlement of allowable damages, we would appreciate your opinion as to the possibility that Owners could recover 100% of damages.

From the Government's perspective, there could be no question but that Henry Newell had authority to represent Golden Panagia. Violanti's testimony makes this clear:

The Plaintiff here cloaked Mr. Newell with all the authority to settle right from the very onset. In fact, in the pleadings it spells out that he had the authority to ... I mean, that he presented his complaint based upon facts supplied to him by the company, he appeared at pre-trial conferences, he appeared at settlement conferences. What more could you expect from our standpoint to believe, that he didn't have any authority?

*Violanti Dep.* at 32.[2]

On this record, and in the almost unique circumstances of this case, we have diffi-

---

**2.** *See also id.* at 55–56:

Q. Was there any other evidence of Newell having authority to bind settlement on behalf of Golden Panagia Steamship, Inc. that you're aware of other than what you just mentioned?
A. Well, from the entire file entitled the Panama Canal Commission, they were dealing with him; that he had filed claims, and I believe he represented the ... he may have represented the company at the Board of Local Inspector's Hearing; and that he sub-

mitted a claim. Those are the kinds of things that were in the file that I was aware of, which would indicate that he had authority. I was certainly ... had never been given the impression otherwise by anybody, by either a law firm or by a principal ... by the Plaintiff.
*Cf. id.* at 72–73:
Q. ... Now, turning previously to the fact of Mr. Newell's representation of Golden Panagia. At any time during this litigation in Balboa, which has been referred to as Golden

culty understanding what further "authority" Newell should, or could, have had for purposes of settling Golden Panagia's claims. As a practical matter, it appears that Newell would not have been able to negotiate effectively, if at all, on Golden Panagia's behalf if his every proposal and counter-proposal had to be processed through some anonymous foreign master. And in any event it is clear that Golden Panagia was following and participating in the developing settlement, which in fact took approximately the form Newell predicted.[3]

If Newell had authority to sign the Consent Judgment on Golden Panagia's behalf, then he also had authority to receive the settlement check, made out to him, on Golden Panagia's behalf. When Newell—along with the U.S. Attorney and the district court—signed the Consent Judgment, Golden Panagia's original claim was, at the stroke of a pen, compromised by more than $100,000. If Newell had no authority to make such a settlement, then he stole that $100,000 from Golden Panagia just as sure-ly as he stole the remaining $195,000. But it seems hard to imagine that Newell's participation in the settlement agreement and the Consent Judgment could be attacked. They only appear suspect now because, in retrospect, Newell appears to be a deadbeat. At the time, there was nothing to put the Government on notice that Newell was anything other than a model of lawyerly respectability.[4]

On Golden Panagia's theory, the Government should presumably have refused to deal with Newell without further documentation of his authority. Then (assuming, *arguendo*, that a settlement could have been reached under such circumstances) the Government should presumably have made direct contact with Newell's client— in effect, "going behind his back"—to see whether it should really pay over a settlement check made out, in the court-approved fashion, to Newell. As the Government observes, this scenario would entail, at the very least, a serious breach of professional ethics by the Government.[5]

---

Panagia versus Panama Canal, and arising from the collision of the World Agamemnon and the motor vessel Golden Panagia, did any other attorney of record or law firm ever make an appearance on the record indicating that they represented Golden Panagia Steamship?

A. No sir, not from October 1, 1979 that I'm aware of, I couldn't find it if they had anywhere in the record.

Q. Okay. You say not from October 1, 1979, I want you to go forward. Did anyone, up until the time the check was tendered, ever make an appearance?

A. No sir.

Q. Okay. Did any persons allegedly representing Golden Panagia, or its agents or any other representatives in Panama or otherwise, ever indicate to the United States Attorney's Office at the time of any limitation of Mr. Newell's authority to settle the matter?

A. No.

3. *See* Plaintiff's Response to United States' First Set of Interrogatories, Summary of telephone conversation between Henry Newell and George Andrews (Oct. 21, 1980):

Newell stated that he had agreed at hearings prior to trial to bifurcate settlement from quantum. Reported that the M/V AGAMEMNON agreed to settlement for 80% of damages allowable on the same basis. George Andrews advised Newell that owners would ac-cept settlement on the above outlined basis, but owners first must know what the allowable items are. Newell stated he would telex both George Andrews and John J. Walsh to confirm allowable damages. Also, he stated the allowable items would include all costs for temporary and permanent repairs and detention.

1 Rec. at 129.

4. *See* Violanti Dep. at 36:

Mr. Newell had a very good reputation. He was friends of the Judges, had been a member of the New Orleans Bar. There was no indication whatsoever that Mr. Newell would ever do anything of the nature in which he's done in this case. In fact, I think one of the members of your law firm came down and indicated similar surprise, I think Norman Sullivan when he came down.

5. Golden Panagia cites *Cia Anon Venezolana de Navegacion v. Harris*, 374 F.2d 33 (5th Cir.1967), as "the leading Fifth Circuit case on this issue," for the proposition that "federal jurisprudence requires actual authority for a settlement to be binding." Appellant's Brief at 16–17. In *Cia Anon* this court determined that the attorney in question *did* have authority to settle, on facts closely similar to those of the present case. *Cia Anon's* attorney had worked closely with the company's New York representative over a

## B. *Negligence, Real and Imagined*

In assessing the negligence claim the district court applied the substantive law of the District of Columbia, since the Justice Department's approval of the disputed payment procedure was made by officials in Washington, D.C. *See* 28 U.S.C. § 1346(b); *Canipe v. National Loss Control Service Corp.*, 736 F.2d 1055 (5th Cir.1984). The district court concluded that in this case "apparent authority" was sufficient to bind a party to its attorney's exercise of authority, that the Government's duty of due care extended only to foreseeable risks, and that Newell's theft of the settlement funds was unforeseeable.

Apparently conceding the bulk of the district court's legal conclusions,[6] Golden

Panagia chooses to quarrel with the court's findings of fact. Golden Panagia first attacks as clearly erroneous the court's finding that no special circumstances existed at the time of the settlement to put any government official on notice that Newell might convert the funds to his own use. *Au contraire*, exclaims Golden Panagia: "[N]ot only was the criminal act foreseeable, it is admitted *it was foreseen.*" Appellant's Brief at 33. Golden Panagia relies for this point on the deposition of Lawrence F. Ledebur, the Justice Department official who approved the check disbursement procedure. But when Ledebur's deposition is actually examined, it turns out to contain only a vague, pale, and wholly innocuous rendition of the picture Golden Panagia paints:

number of years on the case, and opposing counsel had relied on his apparent authority. This court stated that

> The issue quickly narrows to a simple inquiry: Did Wood have authority to bind his client? Appellant insists that there exists a genuine issue of fact on this issue. We do not agree. Wood entered into the agreement. He related the terms of the settlement. Counsel for Pate testified as to Wood's statements that he, Wood, had full authority to settle. He further asserted that Wood had revealed that authority to opposing counsel.... In effect, the argument is that counsel had no right to rely on any authorization received from the claims representative of Appellant with whom he had handled the case for almost two years; and in turn, counsel for the other parties to the litigation could not rely on the representation of Appellant's counsel as to his authority. If such a position is meritorious, an attorney could never rely on the word of opposing counsel in determining authority. Especially would this be true in the case of a corporate defendant. *Such a result would strike at the very basis upon which attorneys and litigants have compromised their differences for decades.*

*Id.* at 35–36 (emphasis added) (footnote omitted). *St. Amand v. Marriott Hotel, Inc.*, 430 F.Supp. 488 (E.D.La.1977), another case cited frequently by Golden Panagia, provides the following gloss on *Cia Anon:*

> The issue in *Cia Anon*, as in this case, was the authority of the attorney to settle. The court found, after reviewing the facts, that counsel had such authority. The lawyer had worked on the case two years and had told the other parties that he had authority to settle, only later to be contradicted by a claim that he had not had authority from an "unnamed person

in Venezuela." It did stress that other counsel's reliance on the attorney's representation, combined with his long association with the case, justified upholding the judgment, particularly where the defendant was a corporation whose alleged internal policies on granting authority to settle were not made known to its own counsel.

*Id.* at 491.

Golden Panagia reaches back to 1901 for a Supreme Court case decided in its favor, *United States v. Beebe*, 180 U.S. 343, 21 S.Ct. 371, 45 L.Ed. 563 (1901), but we reach back even farther to the underlying principles of law, which are set out in an opinion of Chief Justice Marshall, *Holker v. Parker*, 11 U.S. (7 Cranch) 436, 3 L.Ed. 396 (1813), cited with approval and quoted in *Beebe* as follows:

> Although an attorney at law, merely as such, has, strictly speaking, no right to make a compromise, yet a court would be disinclined to disturb one which was not so unreasonable in itself as to be exclaimed against by all, and to create an impression that the judgment of the attorney has been imposed on, or not fairly exercised in the case. But where the sacrifice is such as to leave it scarcely possible that, with a full knowledge of every circumstance, such a compromise could be fairly made, there can be no hesitation in saying that the compromise, being unauthorized and being therefore in itself void, ought not to bind the injured party.

*Beebe*, 180 U.S. at 351–52, 21 S.Ct. at 374–75 (quoting *Holker*, 11 U.S. (7 Cranch) at 452–53).

**6.** *See* Appellant's Brief at 30 ("In Conclusions of Law Nos. 8, 9, 10 and 11 ... the District Court cited several cases for propositions which, although accurate in themselves, do not fully discuss the issue of foreseeability.").

Q. When Mr. Violanti approached you with this particular method of settling cases, did you perceive any dangers or risks in settling the cases in that manner?

A. No. No more than usual. As I say, this was not unique to the Canal Zone.

Q. Well, I understand you say no more than usual, but do you perceive any particular problem in settling cases in that manner?

A. Certainly. If the attorney is dishonest, he can steal money from his client.

Q. Did you perceive that as a risk prior to Mr. Violanti's approaching you with the request of resolving the cases in that manner?

A. I don't know what you mean by perceive it as a risk. I was being aware of human frailty. Since I am human and frail myself, I was aware that there are such a thing as dishonest attorneys in the world, of course. And I was so aware prior to being approached by Mr. Violanti.... I could add I suppose there have been dishonest clients as well in the history of the law as well as dishonest attorneys.

Ledebur Dep. at 25–26.

Golden Panagia also challenges the district court's conclusion that "The United States had no reason to foresee that *Newell* would steal the settlement funds" (emphasis added) as a misapplication of the law: "For a criminal act to be foreseeable, there is no requirement in any jurisdiction that the plaintiff know the name of the criminal who may commit the crime." Appellant's Brief at 33. But here again, it appears that Golden Panagia has gotten the story backward. Ledebur testified that the Justice Department officials in Washington had considered, and rejected as in-

sufficient, the *general* risk posed by dishonest attorneys:

Q. Was there ever any consideration given to not resolving the cases in that manner to avoid that particular risk of dealing with the dishonest attorney who would convert the funds?

A. Other than I suppose since I approved it means that I didn't—I considered and rejected as sufficient grounds for not approving it what you suggest. Yes.

Ledebur Dep. at 26. Meanwhile, in Panama, Violanti had *specific* evidence that Newell did not pose such a risk: "Mr. Newell had a very good reputation. He was friends of the Judges, had been a member of the New Orleans Bar." Violanti Dep. at 36. There was no "requirement" that the Government know that Newell would commit a crime. The Government's affirmative evidence that he would *not* commit a crime was rather in the nature of a bonus, or added data, in the analysis. It tended to confirm that the Government's general supposition was valid in one specific case. As it turned out, of course, both Golden Panagia and the Government were spectacularly wrong about Henry Newell....

## IV. A PANEGYRIC, BUT NOT A PANACEA

This is one of those unfortunate cases in which neither party has really done anything wrong. The real culprit, Henry Newell, is not before this court.[7] Golden Panagia is rightfully aggrieved, but for it to recover damages from the Government under our adversary system of justice it must prove that those damages are fairly traceable to some fault on the Government's part. Under a negligence theory an actor is held accountable only on the basis of the knowledge he could, or should, have had at the time he acted; fault in this context is mea-

---

7. Consistent with its theory that there was no valid settlement, and that the stolen funds still belonged to the Government, Golden Panagia has declined to bring suit against Newell. Counsel for Golden Panagia informed this court at oral argument that Newell is now, in any

event, dead. A Higher Court thus has jurisdiction over Henry Newell, and we are confident that any sins he may have committed will be dealt with appropriately there. *See Matthew* 25:41–46 (explaining Final Judgment procedures).

sured from the perspective of the actor and the then foreseeable future. While in retrospect it probably would have been wiser for the Government not to make out a settlement check payable directly to Henry Newell, we cannot say that, in the circumstances, the Government's conduct or procedures rose to the level of negligence. Thus we can offer Golden Panagia only a panegyric, not a panacea.

We AFFIRM the decisions of the district court in both of the cases on appeal.

AFFIRMED.